UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Heather Rudy, individually and on behalf of all others similarly situated, | 1:21-cv-03575 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Family Dollar Stores, Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1. Family Dollar Stores, Inc. ("defendant") manufactures, labels, markets and sells "Smoked Almonds," in red packaging evocative of fire, under its Eatz brand ("Product").



1

2. Smoking is a processing method to preserve or improve the flavor of food by exposing it to smoke, usually from burning wood.

3. The drying action of the smoke and the different phenol compounds helps to preserve protein-rich foods such as meat, cheese, almonds, and fish.

4. While the popularity of smoking decreased in the mid-20th century due to the introduction of "convenient" chemical preservatives, the last two decades have seen a resurgence in smoked foods, as consumers embrace foods made without advanced chemistry and synthetic ingredients.

5. According to research by Mintel, consumers are increasingly seeking foods that get their taste only from a characterizing ingredient or a natural processing method.

6. Mintel reports that consumers are aware of the lack of transparency in the flavor industry, which has regularly been highlighted by non-profits such as the Environmental Working Group ("EWG").[1]

7. The EWG often identifies foods with "natural" flavors but which also contain "incidental" additives such as emulsifiers and solvents, that may pose health or nutritive risks.

8. Innova Market Insights identified "no added flavor" as an emerging consumer trend.[2]

9. This trend is unique because it is not necessarily based on a "claim," per se, but by the absence of the ubiquitous front label statement which is required to inform consumers that a food's taste is from something *added*.

10. Federal and identical state law requires that a product's front label disclose the source of any characterizing flavor. 21 C.F.R. § 101.22(i).[3]

---

[1] Lynn Dornblaser, Director, Innovation & Insight, Mintel, Clean Label: Why this trend is important now, 2017.
[2] Innova Market Insights, Flavors: Trends and Sustainability, Sept., 2018.
[3] Illinois law incorporates the federal requirements for food labeling.

2

11. "The rule [21 C.F.R. § 101.22(i)] is premised on the simple notion that consumers value 'the real thing' versus a close substitute and should be able to rely on the label to readily distinguish between the two. This consumer protection objective is relevant to taste claims conveyed in advertising as well."[4]

12. The disclosure on a front label of whether a food is flavored by "added smoke flavor" or from being smoked is basic information on which consumers rely when making quick purchasing decisions at the grocery store. 21 C.F.R. § 101.22(i).

13. Federal regulations require that:

> (i) If the food is one that is commonly expected to contain a characterizing food ingredient, e.g., strawberries in "strawberry shortcake", and the food contains natural flavor derived from such ingredient and an amount of characterizing ingredient insufficient to independently characterize the food, or the food contains no such ingredient, the name of the characterizing flavor may be immediately preceded by the word "natural" and shall be immediately followed by the word "flavored" in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., "natural strawberry flavored shortcake," or "strawberry flavored shortcake".

21 C.F.R. § 101.22(i)(1)(i).

14. Where a food's flavor does not come exclusively from a characterizing ingredient or processing method, but contains natural flavor derived from that ingredient or processing method, this must be disclosed to consumers on the front label, in addition to on the ingredient list.

15. Consumers prefer foods that are flavored from a natural production process – being smoked – instead of having added smoke flavor.

16. The European Food Safety Authority reported that many smoke flavorings added to food – to make them seem like they were smoked – were dangerously close to levels which may

---

[4] Steven Steinborn, Hogan & Hartson LLP, Regulations: Making Taste Claims, PreparedFoods.com, August 11, 2006.

be toxic to humans.[5]

17. Added smoke flavor is not only an issue of consumer health, but of quality and value.

18. The FDA has warned companies that fail to accurately inform consumers of foods which are not smoked but only have added smoke flavor:

> If these smoke ingredients [natural smoke flavor] are added flavors, they should be declared in accordance with 21 CFR 101.22 [on the front of the label]; however, if these ingredients describe the smoking process, then they must not be listed as ingredients in the ingredient statement.[6]

19. Defendant's Product is labeled as "Smoked Almonds" and the front label does not disclose the addition of any added natural smoke flavor.

20. Consumers will reasonably expect the Product to have an appreciable amount of its smoked taste from having undergone a smoking process.

21. However, the Product is misrepresented as "Smoked Almonds," and has not been subjected to any smoking.



**INGREDIENTS:** ALMONDS ROASTED IN PEANUT, AND/OR COTTONSEED, AND/OR SUNFLOWER SEED, AND/OR CANOLA OIL, HYDROLYZED SOY PROTEIN, DEXTROSE, TORULA YEAST, SALT, ONION POWDER, NATURAL SMOKE FLAVOR, SPICE EXTRACTIVES, DISODIUM INOSINATE AND DISODIUM GUANYLATE.

---

[5] Faizah Ahmed, Smoke-Flavored Foods May Be Toxic, Food Safety News, Feb. 16, 2010. By on February 16, 2010

[6] FDA Warning Letter, Smoked Seafood, Inc. dba Little Mermaid Smokehouse, MARCS-CMS 515739 — JUNE 27, 2017.

4

22. The ingredient list reveals "NATURAL SMOKE FLAVOR," which purports to be "smoke condensed into a liquid form," instead of from being smoked.[7]

23. However, even if consumers discover this ingredient, it fails to tell them the almonds did not undergo any smoking.

24. Nor does the listing of the first ingredient, "ALMONDS ROASTED IN PEANUT, AND/OR COTTONSEED, AND/OR SUNFLOWER SEED, AND/OR CANOLA OIL," tell consumers the almonds were merely "roasted in oil" *instead* of smoking.

25. In the early 2000s, the almond industry experienced several outbreaks of Salmonella.

26. As a low moisture food, almonds are not generally susceptible to Salmonella.

27. However, cultivation and harvesting practices can introduce this deadly organism, which can cause illness and death at low levels.

28. The result of these outbreaks was a requirement that all almonds be subjected to treatment processes that achieve "a minimum 4-log reduction of Salmonella bacteria in almonds."[8]

29. Thermal treatments to satisfy this criteria include the application of steam, hot water, oil roasting or dry roasting.

30. Non-thermal treatments include the temporary addition of small amounts of the chemical propylene oxide (PPO).

31. The result is that any almonds – even those which are smoked – be subjected to treatment processes to ensure consumer safety.

32. Oil roasting is a widely used methods for achieving pathogen reduction because it does not negatively affect the sensory, organoleptic or nutritive qualities of almonds.

---

[7] Matthew Sedacca, Liquid Smoke: The History Behind a Divisive Culinary Shortcut – Barbecue's love/hate relationship with the manufactured flavor, Eater.com, Jun 15, 2016.
[8] 7 C.F.R. § 981.442

5

33. Oil roasting is also the initial step in smoking almonds, confirmed by a search of the available literature and corroborated by real-life experiences of fans of this food.

34. Natasha Goddard, a food scientist with a Master of Science in Biology, described her experience preparing smoked almonds.[9]

35. Though she made sure to soak the almonds in brine prior to smoking, this compromised their texture.

36. She discovered independently what producers of actual smoked almonds already know – oven-roasting, either before or after smoking, is necessary. them prior to smoking.

37. The widely known chefs at James and Everett describe preparation of "Hickory Smoked Almonds" on their highly trafficked website.[10]

38. The author realized how simple it would be to prepare authentic smoke almonds with a basic electric smoker.

39. After soaking the almonds in a brine solution and applying a dash of spices, seasoning and coating (butter), they were placed in a wire mesh basket.

40. The basket is placed inside the smoker for several hours until they develop a true smoked taste.

41. The writers note that the almonds "may not be as crisp as you like" following the smoking, which "is easily remedied by placing them in a 350°F oven for 10 to 15 minutes."

42. However, they caution against "over-roasting," which can impart "a bitter flavor and dry out the" almonds.

---

[9] Natasha Goddard, First attempt at smoked almonds, June 4, 2014, MetaCookbook.com.
[10] Hickory Smoked Almonds, James & Everett, June 21, 2018.

A. <u>Consumers Expect the Almonds were Subjected to *Some* Smoking</u>

43. Smoked almonds that get their smoked taste exclusively or predominantly from being smoked is not a rare or pricy delicacy that would make a reasonable consumer "double check" the veracity of the front label claim by the fine print ingredient list.

44. Through listing "NATURAL SMOKE FLAVOR" on the ingredient list, the Product tacitly admits that *even if* it has undergone smoking, it was *not smoked enough* to sufficiently impart a characterizing smoke flavor.

45. Consumers are misled because the absence of the qualifying terms, "natural smoke flavored almonds" or "smoke flavored almonds," gives them the false impression that all the smoke taste was due to being smoked. 21 C.F.R. § 101.22(i)(1)(i); 21 U.S.C. § 343(i).

46. Competitor products are truthfully and non-deceptively identified as having added smoke flavor, where consumers expect to see such a disclosure.



"Naturally Flavored"       "Natural Smoke Flavored Almonds"

 

47. Other companies sell smoked almonds which get their smoked taste only from being smoked, instead of any added smoke flavor.

HICKORY SMOKED ALMONDS



B. <u>Added Smoke Flavor is Not Equivalent to Being Smoked</u>

48. Given that the Product acknowledges it contains "NATURAL SMOKE FLAVOR," the only purpose is to provide the smoked taste which is otherwise provided from smoking.

49. The 400 flavor compounds which contribute to a "smoked taste" include pyrazines, aliphatic, aromatic hydrocarbons, alcohols, organic acids, esters, furans, phenols, carbonyl and noncarbonyl compounds, and various oxygen- and nitrogen-containing heterocyclic compounds.

50. Added smoke flavor is unable to impart the same, real smoked taste of real smoking.

51. First, added smoke flavoring lacks the delicate balance of phenolic compounds,

8

including 2,3-Butanedione, 2,3-Pentanedione, 3-Butanoic acid, 3-Methylbutanoic acid, 4-Ethylguaiacol, 4-Propylguaiacol and/or 4-Vinylguaiacol.

52. Second, the smoke generation process dramatically influences the wood-smoke chemical composition, generating compounds that are not capable of being included in a "natural smoke flavor," like trans-isceugenol and 4-methylsyringol.

53. When foods like almonds are exposed to volatiles and particulate matter found in smoke, they undergo chemical reactions which form new flavor compounds.

54. Even if the Product underwent some smoking and has *some* of these flavor compounds, the addition of added smoke flavoring is an acknowledgement it does not have enough of these compounds, which is why it contains added smoke flavor.

55. Third, certain compounds only serve as intermediates in the formation of more stable forms of compounds which are essential to the aroma of smoke.

56. Fourth, in most systems involving only smoke generation – to create "smoke flavor" – instead of smoking food, there is only a focus on volatile compounds which are believed to have distinctive odor properties at low concentrations.

57. This overlooks that nonvolatile compounds significantly contribute to smoke flavor.

**II. CONCLUSION**

58. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes and features of the Product, relative to itself and other comparable products or alternatives.

59. The value of the Product that plaintiff purchased was materially less than its value as represented by defendant.

60. Defendant sold more of the Product and at higher prices than it would have in the

9

Case: 1:21-cv-03575 Document #: 1 Filed: 07/05/21 Page 10 of 16 PageID #:10

absence of this misconduct, resulting in additional profits at the expense of consumers.

61. Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

62. The Product is sold for a price premium compared to other similar products, no less than $1.00 for 7 oz (198 g), a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

## Jurisdiction and Venue

63. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

64. Upon information and belief, the aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

65. Plaintiff Heather Rudy is a citizen of Illinois.

66. Defendant Family Dollar Stores, Inc. is an Delaware corporation with a principal place of business in Chesapeake, Chesapeake City County, Virginia

67. The parties are citizens of different states.

68. Venue is in this district because plaintiff resides in this district and a substantial part of the events or omissions giving rise to the claims occurred here.

## Parties

69. Plaintiff Heather Rudy is a citizen of Gurnee, Lake County, Illinois.

70. Defendant Family Dollar Stores, Inc., is a Delaware corporation with a principal place of business in Chesapeake, Virginia, Chesapeake City County.

71. Defendant has over 8,000 retail stores in all fifty states.

72. While the company's name is "Family Dollar," many Americans have recently

realized that this is not your parent's dollar store.

73. Where "dollar stores" previously contained items of substandard quality, Family Dollar's economies of scale and ability to quickly adapt to changing consumer demand have allowed it to thrive by offering high quality goods.

74. Defendant is known for its tough negotiating tactics with manufacturers of national brand products, who agree to produce their products under the Family Dollar private label or "store brands," including Eatz.

75. These items are equivalent in quality to, and often exceed, their national brand competitors.

76. Plaintiff bought the Product on one or more occasions within the statute of limitations for each cause of action alleged, from defendant's stores including the location at 1106 Washington St, Waukegan, IL 60085, between April and May 2021, among other times.

77. Plaintiff saw the front label that said, "Smoked Almonds," the red coloring, and that there was no mention of added smoke flavor.

78. Plaintiff expected that any smoke taste was entirely from being smoked.

79. Plaintiff wanted more than a "smokey" taste but a product that was sufficiently smoked so that it did not require added "smoke flavor."

80. Plaintiff expected the almonds would have been subjected to more than a *de minimis* amount of smoking, but they were not subject to any smoking.

81. Plaintiff bought the Product at or exceeding the above-referenced price.

82. Plaintiff relied on the representations identified here.

83. Plaintiff would not have purchased the Product if she knew the representations were false and misleading.

84. Plaintiff chose between Defendant's Product and other similar products which were represented similarly, but which did not misrepresent their attributes and/or lower-priced products which did not make the claims made by Defendant.

85. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

86. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance that Product's representations are consistent with its composition.

## Class Allegations

87. The class will consist of Illinois, Texas, Utah, New Mexico, Indiana, West Virginia and North Carolina residents who purchased the Product during the statutes of limitations for each cause of action alleged.

88. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

89. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

90. Plaintiff is an adequate representative because her interests do not conflict with other members.

91. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

92. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

93. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

94. Plaintiff seeks class-wide injunctive relief because the practices continue.

Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.

(Consumer Protection Statute)

95. Plaintiff incorporates by reference all preceding paragraphs.

96. Plaintiff and class members desired to purchase a product which was subjected to at least some smoking, instead of getting all its smoke taste from added smoke flavoring.

97. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

98. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

99. Plaintiff relied on the representations.

100. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Breaches of Express Warranty,
Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.

101. The Product was manufactured, labeled and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it was subjected to at least some smoking, instead of getting all its smoke taste from added smoke flavoring.

102. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

103. This duty is based on Defendant's outsized role in the market for this type of Product.

104. Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

105. Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices.

106. The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable because they were not fit to pass in the trade as advertised.

107. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Negligent Misrepresentation

108. Defendant had a duty to truthfully represent the Product, which it breached.

109. This duty is based on defendant's position, holding itself out as having special knowledge and experience this area, as custodians of the Eatz brand.

110. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, an iconic brand.

111. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

112. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

113. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was subjected to at least some smoking, instead of getting all its smoke taste from added smoke flavoring

114. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

<u>Unjust Enrichment</u>

115. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   July 5, 2021

                                        Respectfully submitted,

                                        Sheehan & Associates, P.C.
                                        /s/Spencer Sheehan

15

60 Cuttermill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com